UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON SANCHEZ, JR.,<br><br>                              Plaintiff,<br><br>v.<br><br>LOEWS HOTELS HOLDING CORPORATION, a Delaware corporation; LOEWS CORONADO HOTEL CORPORATION, a California corporation; and DOES 1 through 20 inclusive,<br><br>                              Defendants. | Case No.:  19-cv-02084 W (MDD)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT [DOC. 12]; AND**<br><br>**(2) GRANTING PLAINTIFF'S EX PARTE APPLICATION FOR THE COURT TO CONSIDER THREE SUPPLEMENTAL EXHIBITS [DOC. 25.]** |

Pending before this Court is Defendants' motion for summary judgment.  The Court decides the matters without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons that follow, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion [Doc. 12].

Further, good cause showing, the Court **GRANTS** Plaintiff's ex parte application for the Court to consider three supplemental exhibits [Doc. 25].

1

## I.   BACKGROUND

2
3
4

On July 4, 2013, Defendants Loews Hotels Holding Corporation and Loews Coronado Hotel Corporation (collectively "Loews") hired Plaintiff Ramon Sanchez, Jr. as a cook at a restaurant in the hotel.  (*Sanchez Dep.* [Doc. 12-2, Ex. A] 32:3–35:22.)

5
6
7
8
9
10
11
12

On May 15, 2015, Sanchez suffered his first seizure while at home.  (*Id.* 46:3–47:17, 50:19–51:3.)  After a two week leave of absence, Sanchez submitted a doctor's note providing the following restrictions from June 2 to June 9: he was not to work more than eight hours per day, was limited to working with cold products, and was to avoid work near ovens and knives.  (*Id.* 49:25–56:4; *5/28/15/ Kaiser Work Status Report* [Doc. 12-2, Ex. 4.)  The note stated that Sanchez would be able to return to work at full capacity on June 10.  Loews granted each of the modified duty requests and moved Sanchez to the salads section for one week.  (*Sanchez Dep.* 49:25–56:4, 57:20–58:8.)

13
14
15
16

Sanchez suffered two more seizures that required leaves of absence in October of 2015 and February of 2016.  (*Sanchez Dep.* 64:16–66:9, 66:14–15; 71:17–73:5; *10/7/15 Kaiser Work Status Report* [Doc. 12-2, Ex. 7]; *3/1/16 Kaiser Work Status Report* [Doc. 12-2, Ex. 8].)

17
18
19
20
21
22
23
24
25
26
27
28

In January of 2017, Sanchez began working at a new Loews restaurant named Crown Landing.  (*Sanchez Dep.* 81:9–21.)  Sanchez alleges he provided his supervisors—Chef Aguirre and Chef Dunn—with doctor's notes dated March 22, 2017, and August 2, 2017, wherein his doctor requested that Sanchez be kept on "a regular schedule during daytime hours."  (*Id.* 123:16–125:7, 163:23–166:16; 168:3–172:9; *8/2/17 Kaiser Letter from Dr. Vidka Hawkins D.O.* [Doc.12-2, Ex. 12]; *3/22/17 Kaiser Letter from Dr. Vidka Hawkins D.O.* [Doc. 12-2, Ex. 14].)  Sanchez claims he gave another copy of the August 2 note to Loews' Human Resources ("HR").  (*Sanchez Decl.* [Doc. 24-1] ¶ 48.)  HR claims it has no record of ever receiving these requests.  (*Neyens Decl.* [Doc. 12-2, Ex. B] ¶ 10.)  Nevertheless, Sanchez began working the morning shift shortly thereafter, but continued to work overtime and six-day weeks.  (*Id.*; 11/9/17 – Scheduling Preference Form [Doc.12-2, Ex. 26].)

On January 15, 2018, Sanchez submitted another doctor's note to HR stating that he was "completely disabled from performing work" and requested a leave of absence through February 12, 2018. (*Sanchez Dep.* 78:1–79:16, 103:13–105:4, 108:24–109:10; *1/29/18 Kaiser Work Status Report* [Doc. 12-2, Ex. 9]; *1/9/18 Kaiser Work Status Report* [Doc. 12-2, Ex. 10].) When Sanchez returned to work, he did so without any work modifications or restrictions.

On May 16, 2018, Sanchez suffered another seizure at home and Loews granted his subsequent request for a leave of absence from May 16 to May 21. (*Sanchez Dep.* 105:5–106:2.) Again, he returned to work at full duty. (*Neyens Decl.* ¶ 13.)

On July 13, 2018, Chef Aguirre took Sanchez to the security office after noticing he was sweating and appeared pale. (*Sanchez Dep.* 188:25–190:6; 250:1–253:23.) According to the incident report, Sanchez was told to sit down and sip some water. (*7/13/18 Employee Incident Report* [Doc. 12-2, Ex. 23].) After about twenty minutes, Security Officer William Masterson reported that Sanchez appeared to be feeling better and permitted him to return to work. (*Id.*; *Masterson Decl.* [Doc. 12-2, Ex. D] ¶¶ 3–4.)

The next day, Sanchez suffered a grand mal seizure while in a walk-in freezer at the restaurant and was taken to the hospital by ambulance where he remained in a coma for four days. (*Sanchez Dep.* 252:8–253:23; *7/14/18 Employee Accident Report* [Doc. 12-2, Ex. 24]; *Sanchez Decl.* ¶ 76.) Sanchez alleges he informed Chef Aguirre that he was not feeling well on the day of his workplace seizure, to which Chef Aguirre replied, "the only way you're leaving early is in an ambulance." (*Sanchez Dep.* 147:11–18; 195:5–197:14.)

Sanchez has been deemed unable to work by his doctor since the incident and remains on medical leave. (*Sanchez Dep.* 211:23–212:6; 214:14–21.)

Sanchez alleges a general environment of hostility existed at the restaurant, beginning with Chef Aguirre and continuing through various supervisory chefs. Specifically, Sanchez alleges that Chef Aguirre mistreated Sanchez and his co-workers at Crown Landing, claiming Aguirre belittled them and slammed utensils around them.

19-cv-02084 W (MDD)

(*Sanchez Dep.* 184:21–188:11.)  According to Sanchez, Chef Aguirre's verbal harassment of Sanchez in particular would increase when Sanchez's symptoms caused him to slow at work.  (*Sanchez Decl.* ¶ 16.)  Further, Sanchez claims Chef Dunn talked to him as if he was stupid and told Sanchez he had a "target on [his] back."  (*Sanchez Decl.* ¶ 43, 51–52; *12/17 Sanchez Letter* [Doc. 24-13, Ex. G].)  During his time at Crown Landing between January 2017 through July 2018, Sanchez alleges Chef Aguirre did not send Sanchez home when he was feeling unwell, did not transfer him to the morning shift, denied his meal and rest breaks, and scheduled him to work overtime and six days a week.  (*Sanchez Dep.* 134:4–137:2.)

On January 24, 2019, Sanchez filed charges with the Department of Fair Employment & Housing ("DFEH").  (*Compl.* [Doc.1-4, Ex. A] ¶ 33.)  On October 1, 2019, following receival of a right to sue letter from the DFEH, Sanchez filed suit in San Diego Superior Court.  Loews timely removed the case to this Court based on diversity jurisdiction.  (*Notice of Removal* [Doc. 1].)

Loews now seeks an order granting summary judgment as to all Sanchez's claims or, in the alternative, partial summary judgment as to each separate unlawful act alleged.  (*P&A* [Doc. 12-1].)  Sanchez opposes.  (*Opp'n* [Doc. 24].)

## II.  LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving

party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot avoid summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Ford Motor Credit Co. v. Daugherty, 279 Fed. Appx. 500, 501 (9th Cir. 2008) (citing Celotex, 477 U.S. at 324). Additionally, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587.

Rule 56(d) provides for partial summary judgment. See Fed. R. Civ. P. 56(d) ("[T]he court . . . shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted."). Under Rule 56(d), the court may grant summary judgment on less than the non-moving party's whole claim. Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc., 313 F.3d 385, 391 (7th Cir. 2002) (Posner, J.). Partial summary

judgment is a mechanism through which the Court deems certain issues established before trial.  Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) (quoting 6 Moore's Federal Practice ¶ 56.20 (3.–2) (2d ed. 1976)).  "The procedure was intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit."  Id.

### III.   DISCUSSION

As an initial matter, Loews moves to exclude all actions alleged by Sanchez to have taken place before January 24, 2018.

### A.   Statute of Limitations and the Continuing Violation Doctrine

The statute of limitations under the Fair Employment and Housing Act ("FEHA") provides that actions alleging FEHA violations must be brought within "one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred."  Cal. Gov't Code § 12960.  Loews argues the allegations that occurred before January 24, 2018—one year before Sanchez filed his DFEH charge—are time barred.  Specifically, Loews targets three discrete allegations:

> (1) being scheduled to work overtime and not being put on a limited schedule in 2015 and 2016; (2) not being transferred to a morning shift or having his work hours limited based on his March and August 2017 doctor's notes; and (3) any alleged harassment by Chef Aguirre (or other chef) from 2016 through January 23, 2018, including being told he "did not belong in fine dining."

(P&A 18:5–9.)

Although these incidents occurred outside the limitations period, Sanchez argues they are properly included under the continuing violation doctrine.  The continuing violation doctrine permits a plaintiff to "recover for unlawful acts occurring outside the limitations period if they continued into that period."  Wassmann v. S. Orange Cty. Cmty. Coll. Dist., 24 Cal. App. 5th 825, 850 (2018) (citing Jumaane v. City of L.A., 241 Cal. App. 4th 1390, 1402 (2015)).  This is because provisions of FEHA, including the limitations period, are "construed liberally" so as "to promote the resolution of

potentially meritorious claims on the merits." <u>Richards v. CH2M Hill, Inc.</u>, 26 Cal. 4th 798, 820 (2001) (quoting <u>Romano v. Rockwell Internat. Inc.</u>, 14 Cal. 4th 479, 493–94 (1996)).  Therefore, under California law, "an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind; . . . (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." <u>Id.</u> at 823.

All three elements are established in this case.  The acts occurring before the statutory period form a linked course of discriminatory conduct and failure to reasonably accommodate a disabled employee.  Further, this alleged conduct appears to have been a pattern occurring with reasonable frequency that continued into the limitations period. Finally, and most importantly, the actions had not become permanent—at no point did Loews indicate that any further efforts to obtain accommodation or end harassment would be futile.  <u>See</u> <u>Richards</u>, 26 Cal. 4th at 823 (explaining that "permanence" in this context should be properly understood to mean "that an employer's statements and actions made clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment would be futile"). Indeed, Loews continued to reach out during Sanchez's current extended medical leave and asserts that Sanchez can return to work.  Thus, the challenged actions are sufficiently linked to unlawful conduct that took place within the limitations period to overcome any assertions of staleness.

## B.  **The Interactive Process and Accommodation**

Loews seeks to establish, through undisputed facts, that it did everything it was required to do under the statute to engage in the interactive process and reasonably accommodate Sanchez.

Under FEHA, a failure to engage in the interactive process and a failure to reasonably accommodate are two distinct claims.  Cal. Gov't Code § 12940(m), (n).

Generally, the employee must initiate the interactive process by requesting reasonable accommodation and cooperate in good faith by providing reasonable medical documentation when the disability is not obvious.  Id.  This typically requires the employee to provide the employer a list of restrictions needed to accommodate the employee.  Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 266 (2000).  Once initiated, the employer is obliged to continuously engage in the interactive process in good faith.  Swanson v. Morongo Unified Sch. Dist., 232 Cal. App. 4th 954, 971 (2014) ("[t]he fact that an employer took some steps to work with an employee to identify reasonable accommodations does not absolve the employer of liability . . .; if the employer is responsible for a later breakdown in the process, it may be held liable").

To establish a failure to accommodate claim, a plaintiff must show that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual. Jensen, 85 Cal. App. 4th at 256.  A plaintiff is a qualified individual if they establish that they can perform the essential functions of the position sought, rather than the essential functions of the existing position.  Id.  Once the employer becomes aware of the need for an accommodation for a qualified individual, the employer must provide a reasonable accommodation unless doing so would cause undue hardship.  § 12940(m)(1).

Genuine issues of material fact exist regarding both claims.  Sanchez clearly initiated the interactive process by informing Loews of his seizure disorder, and the evidence shows that Loews' initial response to Sanchez's request for leave was appropriate.  However, once initiated, Loews had a continuous obligation to engage in the interactive process in good faith and Sanchez has raised a triable issue of fact over whether Loews bears responsibility for breakdowns in the interactive process.  Sanchez alleges he initially gave a doctor's note dated March 22, 2017, to his supervisor, Chef Dunn, indicating Sanchez required a regular schedule during "daytime hours."  (*3/22/17 Kaiser Letter from Dr. Vidka Hawkins D.O.* [Doc. 12-2, Ex. 14].)  After no meaningful change, Sanchez alleges he renewed his efforts by giving doctor's notes dated August 2, 2017, to Chef Aguirre and HR.  (*8/2/17 Kaiser Letter from Dr. Vidka Hawkins D.O.*

[Doc.12-2, Ex. 12].)  This resulted in Loews transferring Sanchez to the morning shift, but continuing to schedule Sanchez for six-day weeks and overtime.  Sanchez contends he told multiple people that he couldn't work overtime and required a regular, five days a week schedule on the morning shift, but that Loews failed to respond.  Based on these facts, a reasonable jury could find, drawing all inferences from the evidence in favor of Sanchez, that Loews caused a breakdown in the interactive process.

With regard to the accommodation claim, Loews was aware that Sanchez was a qualified individual in need of an accommodation, but has presented no evidence it ever considered whether the accommodations provided to Sanchez were sufficient to address the needs of his disability.  While it is true that an employee cannot expect an employer to read his mind and know he secretly wanted a particular accommodation, Sanchez has described numerous situations in which he requested he be scheduled for morning shifts without overtime, including multiple doctor's notes explaining the need for the accommodation, but was ignored.  Loews contends that the doctor's notes stipulating the need for "regular daytime hours" did not require that it refrain from scheduling Sanchez to work overtime or six days a week.  This argument makes summary judgment even less appropriate, however, as the notes' interpretation becomes a genuine issue of material fact.  Indeed, in the correspondence between Sanchez and his doctor leading up to obtaining those notes, the doctor asked if Sanchez "want[ed] a letter to say that he can only work a maximum of 8 hours with no night shift."  (*Letter Correspondence* [Doc.24-7, Ex. A].)  Based on these facts, a jury could find that Loews should have been aware that returning Sanchez to a six-day schedule and overtime hours was an insufficient accommodation.

## C.   Disability Discrimination

A disabled claimant bringing suit under FEHA "can establish a prima facie case by proving that: (1) plaintiff suffers from a disability; (2) plaintiff is a qualified individual; and (3) plaintiff was subjected to an adverse employment action because of the

disability." <u>Brundage v. Hahn</u>, 57 Cal. App. 4th 228, 236 (1997).  Loews argues Sanchez cannot state a prima facie case of disability discrimination because he has not suffered an adverse employment action.  (*P&A* 20:11–13.)  Sanchez argues he can because he was constructively discharged.  (*Opp'n* 13:19–20.)

An "adverse employment action" is one that "materially affects the terms, conditions, or privileges of employment."  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1051 (2005).  "[C]onstructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." <u>Thomas v. Douglas</u>, 877 F.2d 1428, 1434 (9th Cir.1989) (internal quotations and citations omitted).  As a result, a constructive discharge is the functional equivalent of an actual termination rather than a resignation.  <u>Turner v. Anheuser-Busch, Inc.,</u> 7 Cal.4th 1238, 1244–45 (1994).  "The determination of whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a question of fact." <u>Thomas</u>, 877 F.2d at 1434.

Loews argues Sanchez has not suffered an adverse employment action because he has never been terminated and has technically remained employed on an unpaid medical leave of absence since the grand mal seizure on July 13, 2018.  (*P&A* 20:13–14.) However, a plaintiff does not need to formally quit to maintain a constructive discharge claim.  <u>See</u> <u>Colores v. Bd. of Trustees</u>, 105 Cal. App. 4th 1293, 1314 (2003).  In <u>Colores</u>, the issue was whether an employee could still bring an action for wrongful constructive discharge where she took a disability retirement that could allow her to reclaim her position if she recovered sufficiently  The court held that the employee was not precluded from bringing a constructive discharge action where it was based on the claim that working conditions were so intolerable that her preexisting medical condition worsened to the point where she could no longer perform her duties and needed to remove herself from the job. <u>Id.</u> at 1318.

Although this case involves an unpaid medical leave of absence, rather than a disability retirement, a similar analysis applies. An employee who has suffered a forced unpaid medical leave of absence, from which he is unable to return and which resulted from intolerable working conditions, is in the same position as one who was forced to quit as a result of intolerable conditions. In either case, the employer has forced the employee out of the job. It is sufficient to prove that the employer rendered working conditions intolerable, thereby forcing the employee to permanently "leave" the employment.

Sanchez argues the intolerable and discriminatory working conditions leading to his constructive discharge were due in part to Loews' failure to accommodate or engage in the interactive process. In response, Loews points out that a denial of an accommodation request is not an adverse employment action as a matter of law. (*P&A* 20:2–11 (quoting <u>Doe v. Dept. of Corrections and Rehab.</u>, 43 Cal. App. 5th 721, 735–36 (2019).) However, Sanchez is arguing that his constructive discharge—not a failure to accommodate—was the adverse employment action here. In other words, Sanchez is not arguing that the mere denial of a reasonable accommodation was the adverse employment action, but that denying the reasonable accommodation partially caused the intolerable working conditions which led to his constructive discharge. Although a failure to offer a reasonable accommodation and engage in the interactive process cannot be an adverse employment action, it can act as the basis for a constructive discharge claim. <u>See</u> <u>Perez v. Proctor & Gamble Mfg. Co.</u>, 161 F. Supp. 2d 1110, 1124 (2001); <u>Velente-Hook v. E. Plumas Health Care</u>, 368 F. Supp. 2d 1084, 1102 (2005) (finding genuine issues of material fact as to whether an employee was forced to resign due to the employer's failure to offer reasonable accommodation and to engage in interactive process, precluding summary judgment as to the employee's constructive discharge claim).

In addition to the failures to engage in the interactive process and reasonably accommodate discussed above, Sanchez alleges that supervisory employees intentionally created intolerable and discriminatory working conditions sufficient to impute knowledge

to Loews.  See Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497 (9th Cir. 2015) (reversing an award of summary judgment for employer based on a supervisor's statement that "[i]f you're going to stick with being sick . . . [y]ou're not getting paid, and you're not going to be accommodated").  According to Sanchez, his supervisors' verbal harassment would increase when Sanchez's symptoms caused him to slow at work. (*Sanchez Decl.* ¶ 16.)  This ultimately led to supervisors telling Sanchez that he had a "target on his back" and  that the only way he was leaving early was "in an ambulance." (*Id.* ¶ 51; *Sanchez Dep.* 147:11–18; 195:5–197:14.)

When viewing the evidence in the light most favorable to the non-moving party, the Court concludes that a reasonable jury could return a verdict for Sanchez on the disability claim.[1]

### D.    **Disability Harassment**

Sanchez voluntarily abandons his claim for disability harassment.  (*Opp'n* 12:n.2.) Therefore, the Court grants summary judgment as to it.

### E.    **Hostile Work Environment**

To be actionable, Sanchez must demonstrate that he was subject to degrading, insulting, or threatening comments because of his disability which were sufficiently severe or pervasive so as to alter the conditions of employment and create a hostile work environment.  Alexander v. Cmty. Hosp. of Long Beach, 46 Cal. App. 5th 238, 262 (2020).  "[The] acts of harassment cannot be occasional, isolated, sporadic, or trivial; rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature."  Muller v. Auto. Club of So. California, 61 Cal. App. 4th 431, 446 (1998).  "A single harassing incident involving 'physical violence or the threat thereof'

---

[1] Because a constructive discharge cannot be a legitimate adverse employment action, there is no need to address whether the alleged reason for the discharge was pretextual.

19-cv-02084 W (MDD)

may qualify as being severe in the extreme." Hughes v. Pair, 46 Cal. 4th 1035, 1043, 209 P.3d 963, 971 (2009) (quoting Herberg v. Cal. Inst. of the Arts, 101 Cal. App. 4th 142, 151 (2002)).

Viewing all inferences drawn from the underlying facts in the light most favorable to Sanchez, a jury could find that Sanchez was subjected to threatening comments sufficiently severe to create a hostile work environment. On the day Sanchez experienced a gran mal seizure at work, he asked to go home because he was experiencing seizure symptoms. (*Sanchez Decl.* ¶¶ 71-72.) Chef Aguirre's reply—"the only way you're leaving early is in an ambulance"—was a particularly egregious statement given that Chef Aguirre was aware of Sanchez's disability and had removed Sanchez from the kitchen just the day before because he was sweaty and pale. (*Sanchez Dep.* 147:11–18; 195:5–197:14; *Jt. Stmt. Undisputed Facts* [Doc. 26-2] ¶ 91.)

In addition to the particular incident involving Chef Aguirre, Sanchez has depicted a work environment in which he was told he had a target on his back and was verbally harassed when his symptoms caused him to slow at work. (*Sanchez Decl.* ¶¶ 16, 43, 51–52; *12/17 Sanchez Letter* [Doc. 24-13, Ex. G].) The combination of Aguirre's extreme comment and the more general environment of hostility at the restaurant provide sufficient evidence of both subjectively and objectively severe and pervasive harassment because of his disability to reach a jury.

### F.   **Failure to Prevent**

It is an unlawful employment practice "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k). In order to state a claim, Sanchez must show three elements: "1) [he] was subjected to discrimination, harassment or retaliation; 2) [Loews] failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and 3) this failure caused [him] to suffer injury, damage, loss or harm." See Lelaind v. City & Cty. of S.F., 576 F.Supp.2d 1079, 1103 (N.D. Cal. 2008). Section 12940(k) only

19-cv-02084 W (MDD)

applies to "an employer who knew or should have known of discrimination or harassment" and "fail[s] to take prompt remedial action."  <u>Vierria v. Cal. Highway Patrol</u>, 644 F.Supp.2d 1219, 1245 (E.D. Cal. 2009).

Loews argues the failure to prevent harassment and discrimination claim fails because Sanchez cannot establish the underlying derivative claims and because Loews took reasonable steps to prevent harassment and discrimination.  The first argument is moot because the underlying claims for discrimination and harassment have survived this motion.

As to the second argument, Loews contends it maintains anti-discrimination and harassment policies, yet Sanchez never utilized those policies by reporting any improper conduct.  Sanchez alleges he put Loews on notice of the harassment in its kitchens when he reported a Chef to HR for inexplicably ridiculing Sanchez for someone else's spoiled pea soup.  (*Sanchez Decl.* ¶¶ 57-58.)  He claims nothing ever came of his report that the chefs were harassing him.  (*Id.* ¶ 58.)  Although the evidence that Loews was aware that Sanchez was being targeted because of his disability is relatively thin, Sanchez has pointed to just enough to create a genuine issue of material fact to disqualify this claim from adjudication at this stage.

### G.    <u>Intentional Infliction of Emotional Distress</u>

To state a cause of action for intentional infliction of emotional distress ("IIED") a plaintiff must show: (1) extreme and outrageous conduct by defendant; (2) the defendant's intention to inflict or reckless disregard of the probability of causing emotional distress; (3) severe emotional suffering; and (4) that the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.  <u>Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.</u>, 129 Cal. App. 4th 1228, 1259 (2005).  Conduct is outrageous if it goes beyond all possible bounds of decency such that a reasonable person would regard it as intolerable in a civilized community.  <u>Id.</u>  Liability does not extend to mere "trivialities such as indignities,

annoyances, hurt feelings, or bad manners that a reasonable person is expected to endure." Judicial Council Of California Civil Jury Instruction 1602.

Loews makes three main arguments for why Sanchez's IIED claim fails. First, it argues the ambulance comment is not outrageous conduct going beyond the bounds of human decency. The Court respectfully disagrees. Telling a member of your team whom you know has epilepsy and who has told you of the onset of symptoms that the only way they are leaving is in an ambulance is no mere annoyance or indignity a reasonable person should expect to endure in civilized society.

Second, Loews argues the IIED claim is preempted by the Workers' Compensation Act ("WCA"). Under the WCA, any emotional distress caused by the employer's conduct in management decisions such as termination or scheduling is deemed a normal part of the employment relationship and barred by the WCA's exclusive remedy provision. See Cole v. Fair Oaks Fire Protection Dist., 43 Cal. 3d 148, 160 (1987). "The Legislature, however, did not intend that an employer be allowed to raise the exclusivity rule for the purpose of deflecting a claim of discriminatory practices." Accardi v. Superior Court, 17 Cal. App. 4th 341, 352, (1993). Thus, a plaintiff can purse an IIED claim where the conduct at issue violates FEHA. Light v. Dep't of Parks & Recreation, 14 Cal. App. 5th 75, 101 (2017). Sanchez's IIED claim relates to the same set of facts as alleged in the claims for disability discrimination and hostile work environment. Accordingly, the IIED claim is not barred by the exclusivity provision because it is based upon allegations of actions which violate FEHA and are thus outside the normal part of Sanchez's employment environment.

Finally, Loews argues any emotional distress Sanchez suffered was caused by his seizure disorder rather than Loews' conduct. As proof, Loews points to the fact that both Sanchez and his therapist testified that his depression and anxiety are caused by his seizure disorder. (Fact No. 80.) (*Tanaka Dep.* Ex. W [Doc. 24-29] 42:7-14.) However, what the therapist specifically stated is that Sanchez's depression and anxiety symptoms "manifested because . . . he had the seizure where he fell unconscious in the freezer of his

workplace." (*Tanaka Dep.* Ex. W [Doc. 24-29] 42:7-14.)  Thus, contrary to Loews' contention, the therapist testified that the symptoms manifested as a result of the specific incident in the freezer, not Sanchez's epilepsy in general.  Beyond the depression and anxiety, the therapist has also diagnosed Sanchez with post-traumatic stress disorder. (Ex. V [Doc.24-28].)  Such testimony adequately creates a dispute of fact regarding causation to proceed past summary judgment.

### H.   <u>Negligent Infliction of Emotional Distress</u>

Sanchez voluntarily abandons his claim for negligent infliction of emotional distress.  (*Opp'n* 12:n.2.)  Therefore, the Court grants summary judgment as to it.

### I.   <u>Punitive Damages</u>

A plaintiff may recover punitive damages where the defendant is shown "by clear and convincing evidence" to have acted with "oppression, fraud or malice."  <u>Colucci v. T-Mobile USA, Inc.</u>, 48 Cal. App. 5th 442, 450 (2020); Cal. Civ. Code § 3294(a).  "With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."  Cal. Civ. Code § 3294(b).

Sanchez failed to address this claim in his opposition and the undisputed evidence indicates that none of the chefs or HR personnel were officers, directors, or managing agents of Loews.  (*Jt. Stmt. Undisputed Facts* [Doc. 26-2] ¶¶ 81-82.)  Further, there is no indication that any officers, directors, or managing agents consciously disregarded, authorized, or ratified any act of oppression, fraud or malice.  Summary Judgment is granted as to punitive damages.

//

//

16

IV.    CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Loews' Motion for Summary Judgment [Doc. 12].

**IT IS SO ORDERED.**

Dated:  February 8, 2021

_____
Hon. Thomas J. Whelan
United States District Judge

19-cv-02084 W (MDD)